# No. 23-50862

## In the United States Court of Appeals for the Fifth Circuit

Jerry Clayton Gift,
*Plaintiff-Appellant*

v.

Anadarko Petroleum Corporation Change of Control Severance Plan; Occidental Petroleum Corporation; Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee,
*Defendants-Appellees*

On Appeal from the United States District Court for the Western District of Texas, Midland-Odessa Division
Civil Action No. MO: 22-CV-00122-DC

## BRIEF OF APPELLANT JERRY CLAYTON GIFT

**ORAL ARGUMENT REQUESTED**

Amy E. Gibson
amy@gwfirm.com
Texas Bar No. 00793801
David L. Wiley
david@gwfirm.com
Texas Bar No. 24029901
Gibson Wiley PLLC
1500 Jackson Street #109
Dallas, Texas 75201-4923
T: (214) 522-2121
F: (214) 522-2126
*Attorneys for Appellant Jerry Clayton Gift*

### CERTIFICATE OF INTERESTED PERSONS

1.    No. 23-50862; Jerry Clayton Gift v. Anadarko Petroleum Corporation Change of Control Severance Plan; Occidental Petroleum Corporation; Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee

2.    The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| PLAINTIFF–APPELLANT | TRIAL COURT AND APPELLATE COUNSEL FOR PLAINTIFF–APPELLANT |
|---|---|
| Jerry Clayton Gift | Gibson Wiley PLLC<br>Amy E. Gibson<br>David L. Wiley |
|  | **TRIAL COURT COUNSEL FOR PLAINTIFF–APPELLANT [NOW RETIRED]**<br><br>Paul H. Millican [now retired]<br>Gossett, Harrison, Millican & Stipanovich, PC |
| **DEFENDANTS–APPELLEES**<br><br>Anadarko Petroleum Corporation Change of Control Severance Plan<br><br>Occidental Petroleum Corporation<br><br>Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee | **TRIAL COURT AND APPELLATE COUNSEL FOR DEFENDANTS–APPELLEES**<br><br>Norton Rose Fulbright US LLP<br>Kimberly F. Cheeseman<br>Shauna Johnson Clark<br>Andrew Yeh |

| | **ADDITIONAL APPELLATE COUNSEL FOR DEFENDANTS–APPELLEES**<br><br>Norton Rose Fulbright US LLP<br>Kristina Williams |
|---|---|
| **CURRENT AND FORMER OCCIDENTAL PETROLEUM CORPORATION EMPLOYEES WHO SERVED ON THE BENEFITS ADMINISTRATIVE COMMITTEE**<br><br>Mark Grommesh<br>Melissa Jenkins<br>Angela Knight<br>Michele Oubre<br>Madelaine Pfahler<br>Jim Tally | **LEGAL COUNSEL TO ANADARKO PETROLEUM CORPORATION CHANGE OF CONTROL SEVERANCE PLAN**<br><br>Morgan, Lewis & Bockius LLP<br>Lisa H. Barton |
| **COMPANIES POTENTIALLY INTERESTED DUE TO (A) PHANTOM OPTION BENEFITS TRIGGERED WITH COC SEVERANCE OR (B) POTENTIAL RESPONSIBILITY UNDER TEXAS LAW GOVERNING PARTNERSHIPS**<br><br>Western Gas Equity Partners, LP<br>Western Gas Equity Holdings LLC<br>Western Midstream Partners, LP<br>Western Midstream Services, LLC<br>Western Midstream Operating, LP<br>Western Midstream Operating GP, LLC | |

*s/ Amy Gibson*

Amy E. Gibson
Attorney of Record for Appellant Jerry Clayton Gift

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. This case involves (1) an administrative record with numerous duplicate documents, (2) the meaning and requirement of substantial concrete evidence, (3) consideration of industry terms and practices outside the medical context, (4) unusual conflict of interest issues, (5) whether a claim fiduciary may ignore evidence within its control or be imputed with that knowledge, and (6) whether the substantial evidence standard should be changed. Oral discussion of the facts and the applicable precedent should benefit the Court.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................ 2

STATEMENT REGARDING ORAL ARGUMENT ................................... 4

TABLE OF CONTENTS................................................................ 5

TABLE OF AUTHORITIES............................................................ 9

JURISDICTIONAL STATEMENT..................................................... 12

ISSUES PRESENTED.................................................................. 14

1.     Whether the district court conflated two materially different legal standards: one for plan interpretation and one for factual determinations. The district court applied the legal standard for abuse of discretion on *plan interpretation* — *i.e.,* what the words of the plan mean — to factual determinations. Gift did not dispute the meaning of the plan per plan language and written interpretative guidance. Gift did challenge the factual determination under the correct legal standards.

2.     Whether the record contains substantial, concrete evidence clearly supporting the basis for the committee's denial of benefits.

3.     Whether the committee's decision lacks a rational connection between the known facts and the decision or between the found facts and the evidence.

4.     Whether a claim fiduciary may ignore evidence within its control or be imputed with that knowledge.

5.     Whether courts may consider evidence, including expert testimony, on relevant industry terms and practices outside the context of medical evidence.

6.     Whether the committee denied Gift full and fair review on appeal of the OCC issue when it did not decide the appealed reason for denial and changed its reason for denial in the final appeal decision.

7.    Whether the substantial evidence standard should be changed.

STATEMENT OF THE CASE…………………………………………………    15

I.    Index of Abbreviations……………………………………………    15

II.    Procedural History and Rulings……………………………………    16

III.    Factual Background…………………………………………………    18

A.    COC Plan basics…………………………………………………..    18

B.    Good reason: plan language and interpretive guidance………………    19

1.    individualized assessment of participant skills and training…….    19

2.    adequate training required even for new job within general skill set    20

C.    Oxy acquires Anadarko and Western Midstream……………………...    20

D.    Post-acquisition blues: Oxy financial problems and severe cost cutting    21

E.    Cost-cutting and placing Gift in new job assignments for which
he is not skilled or trained……………………………………………    22

1.    Gift's existing job as GGS Field Foreman………………………..    22

2.    Different operations foreman over different operation segments    23

3.    Good reason: procedure writing and operations control center…    24

4.    Subcommittee denial of good reason inquiry
and mislabeling Gift as Pipeline Foreman…………………………    27

F.      Claim under COC Plan………………………………………… 27

      1.      Gift's submission of materials, including job description
        and email from Kermit OCC Foreman
        David Gale ………………………………………………… 27

      2.      Kermit OCC Foreman: safety concerns about untrained
        employees working OCC to cover for OCC employees………… 28

      3.      Industry practices: safety-critical nature of OCC per
        Anadarko and Oxy-Wes OCC Foreman………………………… 29

      4.      Industry and Oxy practices: OCC training ………………… 34

      5.      The committee's denial of benefits ……………………….. 35

      6.      The appeal and committee's decision on appeal ……………… 36

G.      Committee conflict of interest…………………………………… 38

      1.      Committee: highly compensated Oxy executives……………… 38

      2.      COC Plan benefits paid out of Oxy general assets…………….. 39

      3.      Committee attorney: fiduciary conflict………………………… 40

SUMMARY OF ARGUMENT…………………………………………… 41

ARGUMENT……………………………………………………………… 42

I.      Standard of Review……………………………………………….. 42

II.     District court error in applying legal standard for plan interpretation
        to factual determinations [Issue 1] …………………………………… 42

III.    Abuse of discretion on factual determination [Issues 2-4]……………… 45

A.      No concrete evidence to support denial…………………………….. 45

B.    Lack of rational connection —
       ignoring known industry terms and practices.................................    49

C.    Gale and Gift declarations admissible.............................................    50

       1.    evidence of oil and gas industry terminology and practices serves
              the same purpose as evidence of medical terminology...............    50

       2.    admissibility is fair — the committee was required to understand
              oil and gas industry terminology and practices related to the claim    52

D.    Testimony available to the committee as admissible [Issue 5] ..............    54

       1.    available information is part of the administrative record...........    54

       2.    consideration of available information as consistent
              with fiduciary duties.................................................................    57

       3.    information committee knew or should have known as
              admissible even outside the administrative record....................    58

E.    Lack of full and fair review for OCC claim [Issue 6] ..........................    60

F.    Change in substantial evidence standard...........................................    62

CONCLUSION AND RELIEF REQUESTED.................................................    63

AMENDED CERTIFICATE OF SERVICE...................................................    65

CERTIFICATE OF COMPLIANCE...........................................................    66

## TABLE OF AUTHORITIES

### Cases

*Ariana M. v. Humana Health Plan of Tex., Inc.*
884 F.3d 246 (5th Cir. 2018)…………………….........................46, 51, 62

*Cannon v. Unum Life Ins. Co. of Am.*
219 F.R.D. 211 (D. Me. 2004) ……………………………………………54

*Cerrito v. Liberty Life Assur. Co. of Boston*
209 F.R.D. 663 (M.D. Fla. 2002) ………………………………………53

*Conkright v. Frommert*
559 U.S. 506 (2010)………………………………….....................62

*Crosby v. La. Health Serv. & Indem. Co.*
263 647 F.3d 258 (5th Cir. 2011) )…………………………………....51, 56

*D.K. v. United Behavioral Health*
67 F.4th 1224 (10th Cir. 2023) ……………………………………………57

*Gaither v. Aetna Life Ins. Co.*
394 F.3d 792 (10th Cir. 2004) ……………………………………………...57

*Gothard v. Metro. Life Ins. Co.*
491 F.3d 246 (5th Cir. 2007) ……………………………………………53

*Helton v. AT&T, Inc.*
709 F.3d 343 (4th Cir. 2013) …………………………………………58, 59

*Lafleur v. La. Health Serv. & Indem. Co.*
563 F.3d 148 (5th Cir. 2009)……………………………………………61

*Lain v. Unum Life Ins. Co. of Am.*
279 F.3d 337 (5th Cir. 2002)……………………………………43, 45, 49

*Melech v. Life Ins. Co. of N. Am.*
739 F.3d 663 (11th Cir. 2014)………………………………………………………55

*Metro. Life Ins. Co. v. Glenn*
554 U.S. 105 (2008)……………………………………………………………43, 52

*Michael P. v. Blue Cross & Blue Shield of Tex.*,
No. 20-30361, 2021 WL 4314316 (5th Cir. Sept. 22, 2021)………………………..63

*Miller v. United Welfare Fund*
72 F.3d 1066 (2nd Cir. 1995)………………………………………………………53

*Napoli v. Johnson & Johnson, Inc.*
624 Fed. App'x. 861 (5th Cir. 2015)…………………………………..42, 44, 45, 60

*Nelson v. Unum Life Ins. Co. of Am.*
21 F. Supp. 2d 558 (E.D.N.Y. 2003) ……………………………………………54

*Pierre v. Conn. Gen. Life Ins. Co.*
932 F.2d 1552 (5th Cir. 1991), *overruled on other grounds*,
*Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246 (5th Cir. 2018).46, 62

*Robinson v. Aetna Life Ins. Co.*
443 F.3d 389 (5th Cir. 2006) ……………………………………………………60

*Vega v. Nat'l Life Ins. Servs., Inc.*
188 F.3d 287 (5th Cir. 1999), *overruled on other grounds by*
*Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)..…………………….*passim*

*Wilbur v. ARCO Chem. Co.*
974 F.2d 631 (5th Cir. 1992)……………………………………………………43, 47

**Statutes**

28 U.S.C. § 1291…………………………………………………………12

28 U.S.C. § 1331…………………………………………………………12

28 U.S.C. § 1441…………………………………………………………12

29 U.S.C. § 1133……………………………………………………..52, 60

29 U.S.C. § 1104(a)(1)(B)…………………………………….................53

29 U.S.C. § 1451(c)………………………………………….............12, 17

**Rules**

5th Cir. R. 28.2.1………………………………………….......................2

## JURISDICTIONAL STATEMENT

**District Court.** This case involves an employee welfare benefit claim under the Employee Retirement Income Security Act ("ERISA"). Under 29 U.S.C. § 1451(c), state and federal courts have concurrent jurisdiction over this type of ERISA claim. The district court had jurisdiction under 28 U.S.C. § 1331 [federal question] and 29 U.S.C. § 1451(c) [ERISA jurisdiction] following removal under 28 U.S.C. § 1441.

**Court of Appeals.** This Court has jurisdiction under 28 U.S.C. § 1291. On October 30, 2023, the district court granted Defendants' summary judgment motion and denied as moot Defendants' related motion to strike evidence.[1] The same day, the district court signed a final judgment.[2] This is a direct appeal from a final decision of the United States District Court for the Western District of Texas.[3] This is not a case in which direct review may be had in the United States Supreme Court.

**Timeliness of Appeal.** The district court signed the final judgment on October 30, 2023.[4] Gift timely filed a notice of appeal on November 24, 2023.[5]

---

[1] ROA.1899, 1909-1910 (October 30, 2023 Order, introductory ¶, conclusion with orders, signature date).

[2] ROA.1911.

[3] ROA.1911.

[4] ROA.1911.

[5] ROA.1912-1915.

**Final Judgment.** This appeal is from a final judgment that disposes of all parties' claims.[6]

---

[6] ROA.1911.

## ISSUES PRESENTED

1.      Whether the district court conflated two materially different legal standards: one for plan interpretation and one for factual determinations. The district court applied the legal standard for abuse of discretion on *plan interpretation — i.e.,* what the words of the plan mean — to factual determinations. Gift did not dispute the meaning of the plan per plan language and written interpretative guidance. Gift did challenge the factual determination under the correct legal standards.

2.      Whether the record contains substantial, concrete evidence clearly supporting the basis for the committee's denial of benefits.

3.      Whether the committee's decision lacks a rational connection between the known facts and the decision or between the found facts and the evidence.

4.      Whether a claim fiduciary may ignore evidence within its control or be imputed with that knowledge.

5.      Whether courts may consider evidence, including expert testimony, on relevant industry terms and practices outside the context of medical evidence.

6.      Whether the committee denied Gift full and fair review on appeal of the OCC issue when it did not decide the appealed reason for denial and changed its reason for denial in the final appeal decision.

7.      Whether the substantial evidence standard should be changed.

STATEMENT OF THE CASE

## I.    Index of Abbreviations

This brief and the evidentiary record sometimes use the following abbreviations.[7]

| | |
|---|---|
| COC Plan | Anadarko Petroleum Corporation Change of Control Severance Plan |
| committee | Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee |
| subcommittee | Anadarko Petroleum Corporation Change of Control Severance Plan Good Reason Subcommittee |
| Anadarko | Anadarko Petroleum Corporation |
| Oxy | Occidental Petroleum Corporation |
| Oxy-Wes | Western Midstream Partners LP |
| OCC | Operations Control Center |
| Kermit OCC | Operations Control Center at 831 Southeast Avenue Kermit, Texas |
| CRM | control room management |
| MAOP | maximum allowable operating pressure |
| API | American Petroleum Institute, a trade association for the oil and gas industry that has recommended practices |

---

[7] *See, e.g.*, declarations at ROA.1554-1555 ¶ 6 & ROA.1567 ¶ 4.

| DOT | Department of Transportation |
|-----|------------------------------|
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| RP | recommended practices |
| SCADA | Supervisory Control and Data Acquisition software communications system that helps controllers remotely monitor pipeline systems in an OCC |

## II.    Procedural History and Rulings

This is an action under ERISA involving a plan to pay earned compensation severance benefits in the event of a change of control.[8] Gift was a participant in the plan.[9] A change of control occurred when Oxy acquired Anadarko, including affiliate Western Midstream.[10]

Gift resigned from his employment and submitted a claim for plan severance benefits, asserting that he was being required to perform in a job position, or a substantial job assignment, for which he was not skilled or trained.[11] One job involved covering shifts for workers performing safety-critical pipeline monitoring in the OCC —

---

[8] ROA.20, 26.
[9] ROA.1844, 1846; ROA.1848, 1850.
[10] ROA.1844, 1847; ROA.1848, 1851; ROA.807, 812 n.1.
[11] ROA.540-543 (good reason inquiry before claim); ROA.392-393 (initial claim, although addressed as appeal from good reason inquiry decision).

Operations Control Center.[12] The other job involved procedure writing after the procedure writer left and was not replaced.[13]

The committee — the claim fiduciary — denied the claim.[14] Gift timely appealed the decision.[15] On appeal, the committee upheld the denial of benefits but changed the reason on the OCC job assignment.[16] It informed Gift that this was a final decision under the plan claim-and-appeal procedures.[17] This litigation followed. Gift filed suit in state court,[18] which has concurrent jurisdiction over ERISA benefit claims. 29 U.S.C. § 1451(c). Defendants removed the case to the United States District Court for the Western District of Texas, Midland-Odessa Division.[19]

Defendants filed an administrative record[20] and moved for summary judgment.[21] Gift filed a response[22] and a supporting amended appendix[23] that included, among other evidence, administrative record excerpts grouped by topic such as evidence on

---

[12] *See* ROA.542; ROA.392; ROA.1554 ¶ 4, 1558 ¶ 19-22.
[13] *See* ROA.542; ROA.521.
[14] ROA.1750-1754.
[15] ROA.521-522.
[16] ROA.1755-1760.
[17] ROA.1759.
[18] ROA.20
[19] ROA.10-14.
[20] ROA.314-806.
[21] ROA.807-833.
[22] ROA.910-930.
[23] ROA.1547-1851.

the OCC issue.[24] Defendants filed a motion to strike declarations offered in support of the summary judgment response.[25] Gift filed a response to the motion to strike.[26]

On October 30, 2023, the district court granted the summary judgment motion and denied the motion to strike as moot.[27] It signed a final judgment the same day.[28] Gift timely filed a notice of appeal.[29]

## III.    Factual Background

### A.    COC Plan basics

As part of his compensation for work, Gift has certain protections should there be a change of control: he participates in a change of control severance benefit plan.[30] Under the COC Plan, a change of control triggers potential severance benefits. [31] The COC Plan is intended to encourage focus on work and prevent a mass exodus of employees in the event of a looming or possible change of control, like sale or merger.[32]

---

[24] ROA.1682-1707.
[25] ROA.1856-1862.
[26] ROA.1876-1898.
[27] ROA.1899-1910.
[28] ROA.1911.
[29] ROA.1912-1915.
[30] ROA.1844, 1846; ROA.1848, 1850.
[31] ROA.1628, 1635.
[32] *See* ROA.1628 (plan introduction).

Under the COC Plan, a participant may resign with severance benefits if a *good reason* event happens within a year after change of control.[33] There is no dispute in this case over timing or timeliness.[34]

## B.    Good reason: plan language and interpretive guidance

### 1.    individualized assessment of participant skills and training

The good reason plan provision at issue involves requiring a participant to work in a position or assignment for which he or she is not skilled or trained. It says:

> (vi)    the Participant is required, without the Participant's prior written consent, to perform in a job position, or a substantial job assignment, for which he or she is not skilled or trained.[35]

The plan language requires an individualized assessment of skill and training — *for which he or she*. It does not consider what others have done. It does not consider generic job titles or job descriptions. It looks to the individual participant, like Gift.

This individualized assessment is consistent with the committee's own interpretive guidance. Two sets of written interpretive guidance each say:

---

[33] ROA.1684 (form explaining change of control and basics of plan).
[34] ROA.1844, 1846; ROA.1848, 1850.
[35] ROA.1633.

> Whether a Good Reason event has occurred involves a review of the facts and circumstances specific to the individual Participant.[36]

**2.     adequate training required even for new job within general skill set**

The same interpretive guidance requires adequate training for any new job assignment.[37] It requires adequate training even if the new job assignment is within the employee's traditional field of work.[38] It gives these examples:

> Example: An employee is given a new job assignment that is within the employee's traditional field of work and is sent to a week-long training class that is appropriate to prepare the employee to perform the new job duty. This provision has not been met.
>
> Example: An employee is given a new job assignment that is outside of the employee's traditional field of work and given five days of training. It is not reasonable to expect that a typical employee could perform the new job duty after only five days of training. This provision has been met.[39]

**C.     Oxy acquires Anadarko and Western Midstream**

It is undisputed that a change of control occurs when Oxy acquires Anadarko, including affiliate Western Midstream, on or about August 8, 2019.[40]

---

[36] ROA.1666; ROA.1670.
[37] ROA.1666, 1668-1669; ROA.1670, 1672-1673.
[38] ROA.1666, 1668-1669; ROA.1670, 1672-1673.
[39] ROA.1668-1669; ROA.1672-1673.
[40] ROA.1844, 1847; ROA.1848, 1851; ROA.807, 812 n.1.; ROA.540.

**D.**    **Post-acquisition blues: Oxy financial problems and severe cost cutting**

After the change in control, Oxy faces financial pressures, plunging oil prices, and many who question the wisdom of the Anadarko acquisition. Per *Forbes*:

> Oxy stole Anadarko out of from under Chevron [] at the end of their hugely expensive bidding war. But even at the time, most analysts questioned the wisdom of acquiring so much additional debt — including an infusion of $10 billion from Warren Buffet — to pay a premium price for Anadarko and its assets.

David Blackmon, *Oxy Struggles To Cope With The Impacts Of Its Acquisition Of Anadarko*, Forbes (Aug. 11, 2020).

About six months after the acquisition, the pandemic hits, oil prices crater [down to *negative* $37.63 a barrel], and "the specter of layoffs loomed." *See* Mimi Swartz, *How the Most Hyped U.S. Oil Merger in a Decade Went Bust*, Texas Monthly (Feb. 2021). "Oxy stock, worth $47 a share in January [2020], had dropped by March 9 [2020] to about $12 and would stay in that cold, dark nether region for months." *Id.*

Committee member Mark Grommesh admits the severe cost-cutting measures. Once the pandemic hits, Oxy reduces operations "considerably," shutting down drilling and frac crews.[41] Because it is not profitable — oil prices are negative at some

---

[41] ROA.1594 at Grommesh Deposition p. 10 lines 13-24.

point.[42] Oxy "tried to cut our costs."[43] As oil prices are tanking, there is talk about whether the Oxy takeover of Anadarko is working out.[44]

## E.    Cost-cutting and placing Gift in new job assignments for which he is not skilled or trained

In this atmosphere, as shown below, Oxy is not keen to paying overtime wages. Nor is it keen to replacing employees who quit. And that is leading to requiring employees like Gift to take on new job assignments for which they are not skilled or trained.

### 1.    Gift's existing job as GGS Field Foreman

Before and after change of control, Gift works as a GGS Field Foreman.[45] *Field* refers to field operations — meaning operations that are not in the office.[46] GGS Field Foreman work is *inside the fence* — a midstream[47] industry phrase for roles where duties and focus are on the facilities, not how the products get there or leave

---

[42] ROA.1594 at Grommesh Deposition p. 10 line 25 through p. 11 line 10.
[43] ROA.1594 at Grommesh Deposition p. 11 line 6.
[44] ROA.1594 at Grommesh Deposition p. 11 lines 11-19.
[45] *See* ROA.392-393; ROA.405-406; ROA.1568 ¶¶ 10-13.
[46] ROA.1569 ¶ 20.
[47] Oxy-Wes is a midstream company. *Midstream* is the oil and gas business segment where raw materials are processed into different commodities and waste streams. ROA.1568 ¶ 17. *Upstream* is the segment that involves commodity production, like producer sites with well pads to draw commodities from below-ground formations. Upstream may also include related activities like exploration. ROA.1568 ¶ 16. *Downstream* is the segment where commodities are processed into usable products — such as in refineries — or are sold to the consumer — such as natural gas for your home. ROA.1569 ¶ 18.

there.[48] In contrast, the industry phrase *between fences* describe pipelines that go to and from the proverbial fences.[49]

*GGS* stands for gas gathering system.[50] This inside-the-fence system of plant facilities receives a well stream gas flow that includes water, condensate, and gas.[51] It separates water, gas, and condensate.[52] It removes additional water.[53] It removes carbon dioxide and hydrogen sulfide.[54] It compresses the gas to increase gas pressure.[55]

### 2.     Different operations foreman over different operation segments

In this industry, *operations foreman* and *foreman* are generic terms.[56] So, different operations foremen manage different operational segments.[57] Anadarko and Oxy-Wes operations foremen included (a) Operations Control Center Foreman, (b) Gas Gathering System Foreman, (c) Pipeline Foreman, (d) Saltwater Disposal Well Foreman [also sometimes called Water Foreman], and (e) Plant Foreman.[58] They also had some foremen who were *not* considered operations foremen, like the

---

[48] ROA.1569 ¶ 21.
[49] ROA.1569 ¶ 21.
[50] ROA.1568 ¶ 10.
[51] ROA.1568 ¶ 10.
[52] ROA.1568 ¶¶ 10-11.
[53] ROA.1568 ¶¶ 10-11.
[54] ROA.1568 ¶¶ 10-11.
[55] ROA.1568 ¶¶ 10-11.
[56] ROA.1569 ¶ 19; *see also* ROA.1561-1562 ¶¶ 35-38.
[57] ROA.1569 ¶ 19; *see also* ROA.1561-1562 ¶¶ 35-38.
[58] ROA.1569 ¶ 19.

Maintenance Foreman or the Instrument & Electrical Foreman.[59]

### 3.    Good reason: procedure writing and operations control center

In June 2020, Gift submits a *good reason* inquiry for this good reason event: "You are required to perform in a job position, or a substantial job assignment, for which you are not skilled or trained."[60] The form explains:[61]

[59] ROA.1569 ¶ 19.
[60] ROA.1685-1686 (chart listing good reason events; part of good reason inquiry form); ROA.541-542 (better copy).
[61] ROA.1686; ROA.542 (better copy).

So, the *procedure writer* leaves [voluntary separation package] and is not replaced.[62] Oxy-Wes tells Gift he "must" take on *procedure writing* on top of his normal duties.[63] But he "was not trained nor hired" to take on procedure writing.[64] It is undisputed that he is not skilled or trained in procedure writing.[65]

And Oxy-Wes tells Gift he is "expected" to cover 12-hours shifts in the operations control center when Kermit OCC employees are on leave.[66] But he has "zero experience or training" in OCC operations.[67] When he expresses concern, he is told "this is not negotiable."[68]

During the good reason inquiry process, Gift also submits an email string explaining the OCC coverage issue.[69] It states: "Management does not want OCC operators working overtime at all. Foremen will be asked to cover for anyone in OCC needing PTO."[70] And Gift submits an email from his supervisor Marty Mills[71] showing that the OCC coverage is not voluntary:[72]

---

[62] ROA.1686; ROA.542 (better copy).
[63] ROA.1686; ROA.542 (better copy).
[64] ROA.1686; ROA.542 (better copy).
[65] ROA.1686; ROA.542 (better copy).
[66] ROA.1686; ROA.542 (better copy).
[67] ROA.1686; ROA.542 (better copy).
[68] ROA.1686; ROA.542 (better copy).
[69] ROA.1697.
[70] ROA.1697.
[71] ROA.541; ROA.1568 ¶ 14.
[72] ROA.1690; *see also* ROA.1688-1690.

**From:** Mills, Marty
**Sent:** Mon, 1 Jun 2020 18:22:35
**To:** Cook, Chris Gift, Jerry
**Subject:** OCC coverage
**Sensitivity:** Normal

---

Please review the schedule and volunteer to assist with coverage. You are expected to!|

Get Outlook for iOS

He reiterates: "I have zero hours of experience in control center operations during my 20 year career."[73] Finally, he also submits a sample of procedure writing that shows the procedure writer duty shifted to him ["developed by" indicates the procedure writer].[74]

The good reason inquiry process essentially allows participants to test the water on good reason before making a formal benefit claim under the COC Plan.[75] And so before resignation becomes final.[76]

---

[73] ROA.1688.
[74] ROA.349; ROA.354-383.
[75] ROA.540-541 (good reason inquiry form explaining process).
[76] ROA.540-541 (good reason inquiry form explaining process).

### 4.  Subcommittee denial of good reason inquiry and mislabeling Gift as Pipeline Foreman

The subcommittee denies the good reason inquiry.[77] The administrative record contains no substantial, concrete evidence supporting this denial.[78] Statements in the denial letter are not evidence. The only possible support is meeting minutes, which show the subcommittee mislabels Gift as a Pipeline Foreman.[79] Gift is not a Pipeline Foreman.[80] The Pipeline Foreman position is entirely different from his position as GGS Field Foreman.[81]

## F.  Claim under COC Plan

### 1.  Gift's submission of materials, including job description and email from Kermit OCC Foreman David Gale

Gift appeals the good reason inquiry decision,[82] which is treated as a claim under the COC Plan.[83] He submits, among other materials, (1) materials he previously submitted with the good reason inquiry, (2) his Anadarko GSS Field Foreman job description, and (3) an email from David Gale, who was the Kermit OCC Foreman —

---

[77] ROA.1747-1749.
[78] *See generally* ROA.314-806.
[79] ROA.1675-1676.
[80] ROA.1568 ¶ 15.
[81] ROA.1568 ¶ 11; ROA.1569 ¶¶ 19-20; *see supra* Statement of the Case Part III(E)(1).
[82] ROA.392-414.
[83] ROA.684.

*i.e.*, [Oxy-Wes Foreman] — at the time.[84]

### 2. Kermit OCC Foreman: safety concerns about untrained employees working OCC to cover for OCC employees

Kermit OCC Foreman David Gale emails his safety concerns about the new policy under which untrained individuals will cover for his trained Kermit OCC employees who take PTO.[85] The email states:[86]



---

[84] ROA.392-393; ROA.405-406; ROA.410-411; *see also* ROA.1692-1696 for email string.

[85] ROA.410; ROA.1562-1563 ¶ 39.

[86] ROA.410; ROA.1562-1563 ¶ 39.

> My last point is has this issue been addressed with WES upper management in Houston or is it a directive from them? Regardless, I will take my concerns to them and HR prior to my return. I see it as a very critical issue moving forward and something I do not agree with and that I hope is reconsidered.
>
> Thank you,
>
> David Gale
> (281)658-6144
>
> Sent from my iPhone

So, he says the policy is not appropriate behavior for a midstream OCC.[87] He questions why the Kermit OCC is not getting approval for overtime since "OCC is dealing with products that are far more dangerous."[88] He says: "What if something happens with one of the untrained individuals working OCC? That is a risk I would avoid altogether."[89]

### 3. Industry practices: safety-critical nature of OCC per Anadarko and Oxy-Wes OCC Foreman

Paul "David" Gale is a designated expert witness in this case.[90] He has more than 30 years of experience in the oil and gas industry and more than 25 years of experience in pipeline control operations.[91] He was the Kermit OCC Foreman both before

---

[87] ROA.410; *see also* ROA.1562-1563 ¶ 39.
[88] ROA.410; *see also* ROA.1562-1563 ¶ 39.
[89] ROA.410; *see also* ROA.1562-1563 ¶ 39.
[90] ROA.130, 132; *see also* ROA.1553 ¶¶ 1-2 (foundation for fact and expert testimony); ROA.1553 ¶ 3 (witness not paid for time or testimony as a witness; witness not employee of any party); ROA.1555-1557 ¶¶ 7-17 (detailing qualifications, training, and experience over the decades).
[91] ROA.1555 ¶ 7.

and after the change of control.[92] These days, he is Director of Operations for a firm that assesses pipeline companies' control room operations.[93]

An OCC, including the Kermit OCC, is a safety-critical operation.[94] Its job positions are safety-critical job positions.[95] It operates 24-7: day and night, every day.[96] Its employees remotely monitor pipeline flow levels, pipeline pressure levels, and pipeline temperature levels for potential problems.[97] They must understand constraints and nuances that affect flow levels, pressure levels, and temperature levels within a pipeline.[98] They must understand the dynamics and hydraulics of a complex pipeline system.[99]

They remotely monitor product movement in pipelines and respond to alarms.[100] They must know what to do if a particular alarm comes in, such as an alarm on a pump, a fire, or an emergency shut down.[101] They must understand how to use the SCADA software communications system that helps controllers remotely monitor

---

[92] ROA.1554 ¶ 4.
[93] ROA.1554 ¶ 5.
[94] ROA.1558 ¶ 19.
[95] ROA.1558 ¶ 19.
[96] ROA.1558 ¶ 19.
[97] ROA.1558 ¶ 20.
[98] ROA.1558 ¶ 20.
[99] ROA.1558 ¶ 20.
[100] ROA.1558 ¶ 20.
[101] ROA.1558 ¶ 20.

the pipeline system.[102] They must understand the OCC computer screens, which visually look like a spiderweb.[103]

Kermit OCC was particularly complicated because it lacked standardization — it was a poorly put together system.[104] And that requires more diligence and more experience to operate.[105] All of it requires an understanding of hydraulics — fluid dynamics within the pipeline.[106] Otherwise, you will over-pressurize a pipeline section, potentially cause pressure above MAOP — maximum allowable operating pressure, and potentially cause a pipeline leak or pipeline rupture.[107]

Control Room Management ("CRM") components also help explain the complexity and safety-critical importance of OCC work.[108] CRM might include but not be limited to the following:

1. Roles and Responsibilities
A) under normal operating conditions
B) under AOCs — abnormal operating conditions
C) emergency operating conditions

---

[102] ROA.1558 ¶ 20.
[103] ROA.1558 ¶ 20.
[104] ROA.1558 ¶ 21.
[105] ROA.1558 ¶ 21.
[106] ROA.1558-1559 ¶ 23.
[107] ROA.1558-1559 ¶ 23; *see also* ROA.1559 ¶ 24.
[108] ROA.1559-1560 ¶ 25.

2. Controller Information
A) general information
B) SCADA displays
C) point-to-point verification
D) internal communications plan
E) back-up SCADA
F) shift change

3. Fatigue Management
A) shift lengths and rotation
B) shiftwork education
C) fatigue mitigation

4. Alarm Management
A) Alarm Management Plan (AMP)
B) safety-related alarm review process
C) SCADA point review
D) AMP review
E) activity review
F) AMP deficiencies
G) reporting

5. Change Management
A) communications for physical facility or configuration changes
B) change management for control room participation

6. Operating Experience
A) incident reviews
B) lessons learned

7. Controller Training
A) training program development and review
B) training program elements
C) new hire training program
F) ongoing training program[109]

---

[109] ROA.1559-1560 ¶ 25.

Fatigue management is a big part of OCC training and operations.[110] Explosions are often due to controller fatigue.[111] Kermit OCC operations were 24 hours and 7 days a week with 12-hour shifts.[112] It usually had 4 or 5 [trained] employees on a shift. It is well-known in the oil and gas industry that this kind of shift work takes a physical and mental toll on workers.[113] For this reason, it is not safe to overwork an OCC employee to give someone untrained some OCC experience.[114]

Foreseeable consequences of OCC errors involve harm to the safety of workers, the public, the environment, private property, public property, and the operator's business.[115] Those consequences include death, serious injury, property damage, environmental damage, and loss of client contracts.[116] Errors may allow wet gas [not good] to go to a customer, damage customer plant and equipment, and cause loss of customer contracts.[117]

---

[110] ROA.1561 ¶ 30.
[111] ROA.1561 ¶ 30.
[112] ROA.1561 ¶ 30.
[113] ROA.1561 ¶ 31.
[114] *See* ROA.1561 ¶ 31; *see also* ROA.1561 ¶ 32.
[115] ROA.1558 ¶ 22.
[116] ROA.1558 ¶ 22.
[117] ROA.1558 ¶ 22.

Errors may result in blowing a hole in a pipeline.[118] Errors in handling a pipeline leak may cause a vapor cloud explosion.[119] Even in areas without high population concentration, you still have pipeline rights of way that cross areas, like roads, that the public and workers use.[120]

### 4.    Industry and Oxy practices: OCC training

Anadarko hired Gale to (1) help with CRM, (2) get the OCC in line with CRM regulations [under the DOT Pipeline and Hazardous Materials Safety Administration] and (3) to get the OCC in line with American Petroleum Institute recommended practices.[121] Kermit OCC employees must be on top of things and have to be specially trained.[122] Gale worked on developing a new training program that would result in employees having an official OQ — Operator Qualification.[123]

But in the meantime, Gale trains Kermit OCC employees.[124] It takes anywhere from 3-6 months to learn the system, and the same to train someone for anyone entering that specific role.[125] No one can step in to do the work without a minimum of

---

[118] ROA.1558 ¶ 22.
[119] ROA.1558 ¶ 22.
[120] ROA.1558 ¶ 22.
[121] ROA.1560 ¶ 26; *see also* ROA.1560 ¶ 27.
[122] ROA.1560 ¶ 28.
[123] ROA.1560 ¶ 28.
[124] ROA.1560-1561 ¶ 29.
[125] ROA.1560 ¶ 29.

3 months of training.[126] You cannot just go from any other position in the company with a command to go do that — work in the Kermit OCC.[127] You cannot just place a warm body in the Kermit OCC to fill positions.[128] Kermit OCC employees must be trained.[129] Even then, some people ultimately cannot do the work because they do not understand hydraulics or cannot work under pressure.[130]

### 5.    The committee's denial of benefits

The committee denies COC Plan benefits.[131] For procedure writing, it claims if Gift knows how to do the work and therefore knows how to write procedure.[132] For OCC Coverage, it claims that OCC coverage is voluntary — just a learning experience.[133]

The administrative record contains no substantial, concrete evidence supporting this denial.[134] Statements in the denial letter are not evidence. The only possible support is meeting minutes, which contain conclusory, speculative statements from

---

[126] ROA.1560 ¶ 29.
[127] ROA.1560 ¶ 29.
[128] ROA.1560 ¶ 29.
[129] ROA.1560 ¶ 29.
[130] ROA.1560-1561 ¶ 29.
[131] ROA.1750-1754.
[132] ROA.1751.
[133] ROA.1751.
[134] *See generally* ROA.314-806.

someone not shown to be qualified to speak to the issues.[135] The committee does not address the specific evidence Gift submitted.[136] It does not attempt to speak with Gale.[137] The minutes, even down to OCC phone duties, are contrary to even basic understanding of filling in for any OCC employee on leave, much less a basic understanding of the industry.[138]

### 6.    The appeal and committee's decision on appeal

Gift appeals the decision.[139] He includes with his appeal, among other documents, two affidavits.[140] The first affidavit addresses the OCC basis for denial [OCC coverage was voluntary]:[141]

> The reporting structure for my work group was I reported to Marty Mills, who reported to Brett Clark, who then reported to Jay Westre. Jay Westre stated that "Operations Foremen would need to back fill PTO for OCC Operators", he also started that this was "not negotiable". Brett Clark stated that "What Jay want he will get" and that "it would be better to volunteer than to be voluntold". Marty mills expressed that this was an Overtime reduction effort and that I was expected to do my part.

And the record already includes a supervisor email telling Gift he is expected to

---

[135] ROA.1677-1678.

[136] ROA.1677-1678.

[137] ROA.1677-1678.

[138] ROA.1561 ¶ 33. Minutes were first provided during this litigation and only upon request after Defendants claimed to have provided the administrative record.

[139] ROA.521-527.

[140] ROA.523, 524.

[141] ROA.523.

provide OCC coverage.

The second affidavit addresses procedure writing.[142] It shows that skill in testing procedure is a different skillset than writing the procedure:[143]

> When I was an Operations Foreman for Anadarko Petroleum, I never wrote procedures. In fact, the process for new procedure was:
>
> 1) The ASMITRN Coordinator would write the procedure
> 2) I would work to verify the procedure.
> 3) If the procedure were not accurate, I would take the procedure back to the ASMITRN Coordinator to be rewritten.
> 4) If the procedure were correct, I would train my employees on the procedure.
>
> When I was hired to the Operations Foreman role, I did not have any procedure writing training or experience.

The committee upholds the original decision.[144] It claims to have based the decision on a conversation with a measurement technician.[145] But a measurement technician is not qualified to speak to OCC [or procedure writing] issues.[146] A measurement technician measures product coming in and product going out.[147] That role is "not in the same wheelhouse" with OCC employees.[148]

---

[142] ROA.524.
[143] ROA.524.
[144] ROA.1755-1760.
[145] ROA.1755.
[146] ROA.1561 ¶ 34.
[147] ROA.1561 ¶ 34; *see also* ROA.1570 ¶ 26.
[148] ROA.1561 ¶ 34.

The committee does not decide the issue of whether the OCC coverage is voluntary — the original reason for denial of benefits on the OCC issue.[149] It changes its reason for denial, concluding "you had the necessary skills and training to work in the OCC."[150]

The administrative record contains no substantial, concrete evidence supporting this denial.[151] Again, statements in the denial letter are not evidence. The only possible support is from someone the committee claims to be a measurement technician. And even then, the meeting minutes contain conclusory, speculative statements that are contrary to what the industry, Oxy, Oxy-Wes, and the committee knew or should have known.[152]

## G.     Committee conflict of interest

### 1.     Committee: highly compensated Oxy executives

The committee members [plan and claim administrators] were all Oxy employees.[153] And they were all Oxy executives, with two exceptions.[154] One of those

---

[149] ROA.1757 (addressing issue as "even if you were required to work in the OCC").
[150] ROA.1757.
[151] *See generally* ROA.314-806.
[152] *See* ROA.1680-1681.
[153] ROA.1591 Grommesh Deposition p. 7 lines 6-12.
[154] ROA.1611 Knight Deposition p. 15 lines 6-17.

exceptions still participated in a deferred compensation top hat plan,[155] had an annual salary over $200,000,[156] was eligible for bonuses based in part on Oxy performance,[157] owned Oxy stock, and participated in an Oxy stock plan.[158]

Another committee member and Oxy executive based in Houston[159] is now Vice President of Business Development for all United States onshore assets.[160] While a committee member, he had a base salary over $300,000,[161] was eligible for cash bonuses based on Oxy performance and Oxy stock option bonuses,[162] and owned Oxy stock.[163] His highest recent bonus was around $900,000.[164]

### 2.    COC Plan benefits paid out of Oxy general assets

COC Plan benefits are paid from Oxy general assets.[165] The COC Plan also makes Oxy financially responsible for payment of benefits.[166] So, Oxy potentially benefits from each denied claim under the COC Plan. And Oxy employees and executives on

---

[155] ROA.1611 Knight Deposition p. 16 lines 10-22.

[156] ROA.1612, Knight Deposition p. 18 lines 6-15.

[157] ROA.1612, Knight Deposition p. 18 lines 16-19 & p. 19 lines 14-18.

[158] ROA.1612, Knight Deposition p. 20 lines 8-13.

[159] ROA.1593, Grommesh Deposition p. 7 lines 19-20; ROA.1591, Grommesh Deposition p. 9 lines 20-21; *see also* ROA.1592 Grommesh Deposition p. 7 line 21 through p. 8 line 1.

[160] ROA.1591 Grommesh Deposition p. 8 lines 17-19.

[161] ROA.1592 Grommesh Deposition p. 12 lines 19-24.

[162] ROA.1594-1595 Grommesh Deposition p. 12 line 25 through p. 13 line 15; p. 14, 4-16.

[163] ROA.1595 Grommesh Deposition p. 14 lines 1-3.

[164] ROA.1595 Grommesh Deposition p. 14 line 21 through p. 15 line 6.

[165] ROA.1662-1663.

[166] ROA.1641.

the committee are being paid from the same pool of funds and receive bonuses based on Oxy performance.

### 3.    Committee attorney: fiduciary conflict

For legal services concerning the COC Plan, attorney Lisa Barton believes her clients are (a) the plan and (b) the committee members who serve as plan administrator and so plan fiduciaries.[167] So, she believes her fiduciary duties run to the plan and the committee members.[168] She says her attorney role is "not as an ERISA fiduciary."[169] Oxy pays her firm hourly for her to do training and "assist[] the committee with their duties."[170]

A reasonable inference, then, is that Barton zealously represents the plan and plan fiduciaries, but not plan participants like Jerry. And that is a problem because Barton prepares the meeting minutes and the denial letters.[171] Barton does not believe she is operating under any duty to the participants. So, she can do things the fiduciaries *cannot* when recording minutes and preparing letters.

---

[167] ROA.1574 Barton Deposition p. 5 line 23 through p. 6 line 7.
[168] ROA.1574 Barton Deposition p. 6 line 11 through p. 7 line 5.
[169] ROA.1574 Barton Deposition p. 7 lines 2-4.
[170] ROA.1574-1575 Barton Deposition p. 8 line 9 through p. 9 line 9; *see also* ROA.1574 Barton Deposition p. 8 lines 3-8.
[171] ROA.1835, 1838.

## SUMMARY OF ARGUMENT

The district court conflated two materially different legal standards: one for plan interpretation and one for factual determinations. It applied the legal standard for abuse of discretion on *plan interpretation — i.e.,* what the words of the plan mean — to factual determinations. Gift did not dispute the meaning of the plan per plan language and written interpretative guidance. Gift did challenge the factual determination under the correct legal standards.

The record does not contain any substantial, concrete evidence clearly supporting the basis for the committee's denial of benefits. The committee's decision lacks a rational connection between the known facts and the decision or between the found facts and the evidence. The committee was not free to ignore evidence within its control. It should be imputed with that knowledge. Courts may consider evidence, including expert testimony, on relevant industry terms and practices outside the context of medical evidence.

The committee denied Gift full and fair review on appeal of the OCC issue when it did not decide the appealed reason for denial and changed its reason for denial in the final appeal decision. Finally, alternatively, the substantial evidence standard should be changed.

<h1 style="text-align:center">ARGUMENT[172]</h1>

## I.   Standard of Review

This Court reviews "the district court's grant of summary judgment in an ERISA case *de novo*, applying the same standard as the district court." *Napoli v. Johnson & Johnson, Inc.,* 624 Fed. App'x. 861, 863 (5ᵗʰ Cir. 2015). Here, the parties agree that the COC Plan grants discretion to the committee, so the decision is reviewed for abuse of discretion. *Id.*

## II.   District court error in applying legal standard for plan interpretation to factual determinations [Issue 1]

In ERISA benefit cases like this one, there are at least 3 different paths to abuse of discretion. Each path has its own legal standard. The image below depicts these paths.



---

[172] Unless otherwise noted, Jerry Gift's attorneys have (1) supplied all emphases, (2) omitted from quoted passages in legal authority all internal quotation marks, internal citations, and internal footnotes, and (3) omitted from citations to legal authority all citing and quoting references. This brief is paginated to match the CM/ECF document pagination.

Of course, at times, lack of full and fair review may simply inform the factual abuse of discretion analysis.

The legal standard for abuse of discretion in plan interpretation — *i.e.*, what the plan language means — involves a two-step process. Step one is whether the administrator's plan interpretation is legally correct. *Wilbur v. ARCO Chem. Co.*, 974 F.2d 631, 637 (5th Cir. 1992). If legally correct, the plan interpretation inquiry ends. *See id*. If not legally correct, step two is whether the administrator abused its discretion in plan interpretation, with certain factors to be considered. *Id*. at 637, 638.

The legal standard for abuse of discretion in factual determinations includes, at a minimum, consideration of (1) conflict of interest, *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008), (2) whether substantial, concrete evidence clearly supports the basis for denial, *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 302 (5th Cir. 1999), *overruled on other grounds by Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008); *Lain v. Unum Life Ins. Co. of Am.,* 279 F.3d 337, 342 (5th Cir. 2002), and (3) whether there exists "a rational connection between the known facts and the decision or between the found facts and the evidence." *Lain,* 279 F.3d at 342. The district court opinion does not include anywhere the words concrete, substantial evidence, or

"rational connection."[173]

Lack of full and fair review may also independently show abuse of discretion. *Napoli v. Johnson & Johnson, Inc.,* 624 Fed. App'x. 861, 865 (5th Cir. 2015) ("The lack of a 'full and fair review' … is an independent basis to overturn a plan administrator's denial of benefits."). Or it may be additional evidence of abuse of discretion.

Gift does not challenge plan interpretation in his summary judgment response. The response states: "At this point, there does not appear to be disagreement over the meaning of plan terms."[174]

But the district court addresses plan interpretation, incorrectly claiming that Gift argued the committee did not give the plan a "fair reading."[175] It conflates two materially different legal standards: one for plan interpretation and one for factual determinations. It applies the legal standard for abuse of discretion on *plan interpretation — i.e.,* what the words of the plan mean — to factual determinations.[176] Gift does not dispute the meaning of the plan per plan language and written interpretative guidance. Gift does challenge the factual determination under the correct legal

---

[173] This is based on a search for these terms in the opinion.

[174] ROA.916.

[175] *See, e.g.,* ROA.1904.

[176] *See generally* ROA.1904, 1906-1909.

standards. Due to the conflation of legal standards, the Court never reaches the factual determination issue.[177]

## III.    Abuse of discretion on factual determination [Issues 2-5]

## A.    No concrete evidence to support denial

Q.·When it comes to monitoring pipelines for public safety, financial safety, like property damage, and proper delivery, is it ever a good idea to put an untrained and unskilled person in that position?
A. I would say no …

—Lisa Barton, Oxy Committee Attorney,
ROA.1586, Barton Depo p. 53, lines 10-15

"Without some concrete evidence in the administrative record that supports the denial of the claim, [courts] must find the administrator abused its discretion." *Vega*, 188 F.3d at 302. An administrator's decision to deny benefits must be "based on evidence, even if disputable, that clearly supports the basis for its denial." *Lain,* 279 F.3d at 342.

Even "the substantial evidence standard does require the administrator to rely on more than conclusory statements and cursory references …." *Napoli,* 624 Fed. App'x. at 865. Courts "owe no deference" to "unsupported suspicions." *Vega*, 188 F.3d at 302.

---

[177] *See, e.g.,* ROA.1909.

Courts are not required to accept uncorroborated hearsay as support for a benefit denial. The Fifth Circuit explains. "On review, however, we can require that the hearsay meet certain indicia of reliability; if it does not, the abuse of discretion standard permits the court to reject the finding." *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552, 1562 (5th Cir. 1991), *overruled on other grounds*, *Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246 (5th Cir. 2018).

And it poses a hypothetical: an uncorroborated, hearsay statement from an interested witness. *Id.* at 1563. It explains: the "abuse of discretion standard would permit us to conclude that, because of the witness's self-serving interests, the decision to deny benefits based on this statement, without more, would be beyond the bounds of a reasonable judgment." *Id.*

The record is replete with substantial evidence supporting COC Plan benefits for Gift for either (1) the new procedure writing job assignment or (2) the new requirement to fill in for Kermit OCC employees on leave.[178] The committee members have significant conflicts of interest including executive level pay, stock, and at least one bonus of close to $1 million.[179] All while COC Plan benefits are paid from Oxy general

---

[178] *See supra*, Statement of the Case Parts III(E)-(F).
[179] *See supra*, Statement of the Case Part III(G)(1)-(3).

assets[180] and cost cutting is extreme to the point of stopping certain overtime pay.[181]

Attorney Barton has, or believes she has, a conflicting fiduciary duty — meaning a fiduciary duty owed to the committee, *not* the plan participants *to whom the committee* owes fiduciary duties.[182] A reasonable inference is that Barton zealously represents the plan and committee, but not plan participants like Jerry. And that is a problem when she prepares the meeting minutes and the denial letters.[183] Barton does not believe she is operating under any duty to the participants. So, she can do things the fiduciaries *cannot* when recording minutes and preparing letters.

It is also possible that the conflict is worse. In advising on plan administration, Barton may owe fiduciary duties to participants like Gift. "An ERISA plan is a separate legal entity from its sponsor [], and a plan's administrator owes a fiduciary duty to the plan's beneficiaries, not its sponsor." *Wilbur*, 974 F.2d at 645. "When an attorney advises a plan administrator or other fiduciary concerning plan administration, the attorney's clients are the plan beneficiaries for whom the fiduciary acts, not the plan administrator." *Id.*

---

[180] *See supra* Statement of the Case Part III(G)(2).
[181] *See supra* Statement of the Case Part III(F)(1)-(3).
[182] *See supra* Statement of the Case Part III(G)(3).
[183] ROA.1835, 1838.

The only "evidence" arguably supporting the benefits denial is the minutes that Lisa Barton took.[184] Minutes contain conclusions and irrelevant statements from call-in speakers. There is no audio recording, video recording, transcript, or witness statement that shows the full content of what these speakers actually said. There is no evidence as to these speakers' alleged qualifications to speak to these issues. There is no evidence of who selected these speakers or how. And many of the statements are just irrelevant. For example, the subcommittee wrongly labels Gift as a pipeline foreman.[185] And discussion about regulations does not address whether training was actually required in the Kermit OCC. In reality, training was required and critical because the OCC is a safety-critical operation.[186] As another example, the committee claims to rely on a measurement technician, which has nothing to do with procedure writing or OCC operations.[187]

---

[184] *See, e.g., supra*, Statement of the Case Part III(G)(3) & Part III(F)(5)-(6).
[185] *See supra*, Statement of the Case Part III(E)(4).
[186] *See supra* Statement of the Case Part III(F)(2)-(4).
[187] *See supra* Statement of the Case Part III(F)(6).

**B.    Lack of rational connection —
ignoring known industry terms and practices**

Likewise, evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim would be equally admissible.

*—Vega,* 188 F.3d at 302

An administrator abuses its discretion when its decision lacks "a rational connection between the known facts and the decision or between the found facts and the evidence." *Lain,* 279 F.3d at 342. Fiduciaries must understand basic industry terms and practices relevant to a claim. As Barton put it: "So I guess I would just say that, you know, my understanding of ERISA is that you don't have to be an expert, but if you don't have an expert, you need to find an expert."[188]

Here, the findings reflect a lack of any rational connection — or plain bias. The findings and analysis ignore industry terms. Two declarations address those industry terms as is permitted under ERISA.[189] One of those is from the head of the Kermit OCC at the time. Again, the committee claims it spoke with a "measurement technician" to address the Kermit OCC. But, again, a measurement technician is not

---

[188] ROA.1580 Barton Depo. p. 29 lines 16-19; *see also* for context question at ROA.1579 Barton Depo. p. 28 lines 12-16 & question and answer at ROA.1580 Barton Depo, p. 29 lines 14-23. Barton does not have firsthand knowledge of the depth or quality of the industry knowledge the committee members had. ROA.1582 Barton Depo, p. 37 lines 6-14.

[189] ROA.1553-1564, David Gale Declaration; ROA.1566-1571, Jerry Gift Declaration; *see also supra* Statement of the Case Part III(F).

qualified to speak to that issue. As another example of bias, overreach, abuse … or lack of basic knowledge of industry terms … an operations foreman is just a generic term for manager.[190] It does not mean, as the committee implies, knowledge of all operations. What it means depends on the specific context, like OCC foreman, Pipeline foreman, Gas Gathering System Foreman, etc.[191]

Discretion for fiduciaries is constrained by those fiduciary duties. Fiduciaries like the committee cannot spin facts, ignore important evidence, consider less than all the evidence submitted, or misstate the contents of records. And they must understand or undertake to understand basic industry terms and practices concerning the claim.

## C.    Gale and Gift declarations admissible

### 1.    evidence of oil and gas industry terminology and practices serves the same purpose as evidence of medical terminology and practices

Likewise, evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim would be equally admissible.

> — *Vega v. Nat'l Life Ins. Servs., Inc.*
> 188 F.3d at 299

---

[190] *See supra* Statement of the Case Part III(E)(2).
[191] *See supra* Statement of the Case Part III(E)(1)-(2).

As stated above, the Fifth Circuit, sitting en banc, made clear that such evidence is admissible. It did so in the context of an ERISA claim under a health benefit plan. *Id*. at 288 & 288-89. It did so in the context of abuse of discretion review. *Id*. at 289 & 302.

The Fifth Circuit later clarified that the district court may consider such evidence to resolve the merits. *Crosby v. La. Health Serv. & Indem. Co.*, 263 647 F.3d 258, 263 (5th Cir. 2011). In a later en banc decision, it clarified that such evidence is "not actually expanding the evidence on which the merits are evaluated but providing context to help the court evaluate the administrative record." *Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246, 256 (5th Cir. 2018).

For example, if the issue here involved whether an orthopedic surgeon was skilled or trained to perform robotic-assisted radical prostatectomy surgery, evidence explaining the medical terminology and practices — orthopedic surgery and robotic-assisted radical prostatectomy — would be admissible to provide context and so help the Court evaluate the administrative record. And it may be difficult to assess the record for abuse of discretion *without* an understanding of the medical terminology and practices related to the claim.

When, as here, the terminology and practices related to the claim involve the oil and gas industry, the same evidentiary analysis should apply. Evidence about oil and gas industry terminology and practices related to this claim is admissible to provide context and so help evaluate the administrative record for abuse of discretion. For example, one issue here is whether a GGS field foreman [Gift] was skilled or trained to work in the OCC when the record is undisputed that Gift had no prior experience in an OCC. Evidence explaining GGS, field foreman, and OCC is admissible to provide context. And it may be difficult to assess the record for abuse of discretion *without* an understanding of industry terminology and practices.

### 2.    admissibility is fair — the committee was required to understand oil and gas industry terminology and practices related to the claim

ERISA "sets forth a special standard of care upon a plan administrator, namely, that the administrator discharge [its] duties in respect to discretionary claims processing solely in the interests of the [plan] participants …." *Glenn*, 554 U.S. at 115. It "simultaneously underscores the particular importance of accurate claims processing by insisting that administrators provide a 'full and fair review' of claim denials." *Id.*[192]

---

[192] *See also* 29 U.S.C. § 1133 ("… every employee benefit plan shall— (1) provide adequate notice in writing to any participant … whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and (2) afford a reasonable opportunity to any participant whose claim for benefits has

Consistent with those fiduciary duties, if the committee lacked necessary expertise, then it had to consult with someone who had the necessary expertise. *See, e.g.*, *Miller v. United Welfare Fund*, 72 F.3d 1066, 1073 (2ⁿᵈ Cir. 1995) (ERISA benefits case) ("[T]rustees have an affirmative duty to seek expert advice when required."); 29 U.S.C. § 1104(a)(1)(B) (plan fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.").[193]

This includes expertise in understanding oil and gas industry terminology and practices related to the claim. As the COC Plan attorney put it: "[M]y understanding of ERISA is that you don't have to be an expert, but if you don't have an expert, you need to find an expert."[194] In other words, claimants are not expected to educate the

---

been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.").

[193] *See also Cf. Gothard v. Metro. Life Ins. Co.*, 491 F.3d 246, 250 (5ᵗʰ Cir. 2007) ("We do not hold that a plan fiduciary has no obligation to consider the basis of the expert opinion on which they are relying at summary judgment, or that a fiduciary may rely on an opinion that is in plain conflict with medical records."); *Cerrito v. Liberty Life Assur. Co. of Boston*, 209 F.R.D. 663, 664 (M.D. Fla. 2002) ("[C]ourts have generally permitted discovery, even in instances in which an 'arbitrary and capricious' standard applies, in order to assist the court in evaluating … 2) whether the fiduciary was competent to evaluate the information in the administrative record; … 4) whether, given the nature of the information in the record, it was incumbent upon the fiduciary to seek outside technical assistance in reaching a 'fair and full review' of the claim' ….").

[194] ROA.1580 Barton Deposition p. 29 lines 16-19.

claim administrator on terms and practices related to the claim. The claim administrator is already supposed to understand those terms and practices.

## D.    Testimony available to the committee as admissible [Issue 5]

### 1.    available information is part of the administrative record

We hold today that the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it.

— *Vega*
188 F.3d at 300

The Gale and Gift declarations include "relevant information" that (1) was "available" to the committee and (2) the committee "had a fair opportunity to consider." The *availability* and *fair opportunity* requirements are not limited to information the claimant submits to the administrator. For example, claims-handling guidelines not gathered as part of the record fall within this category. *See, e.g., Nelson v. Unum Life Ins. Co. of Am.*, 421 F. Supp. 2d 558, 573 (E.D.N.Y. 2003) ("Although review of the denial of benefits is limited to the administrative record, consideration of the Unum Claims Manual is permissible, because it was also available to Unum when it was evaluating plaintiff's claim."); *Cannon v. Unum Life Ins. Co. of Am.*, 219

F.R.D. 211, 213 (D. Me. 2004) ("Obviously, if Unum has internal memoranda or policies that instruct claim handlers how to apply the mental illness limitation, such materials are relevant to the question of whether Unum acted arbitrarily and capriciously in connection with its denial of the plaintiffs claim.").

In ERISA cases involving disability, Social Security Administration disability findings may also fall within this category. *See, e.g.*, *Melech v. Life Ins. Co. of N. Am.*, 739 F.3d 663, 675, 676 (11th Cir. 2014) ("In Melech's case, LINA refused to wait for the SSA evidence, even though it could have relied on that same evidence to protect its SSDI deduction had it decided to pay Melech's claim. LINA is not free to selectively use evidence in this manner. … We are similarly struck by the procedural unfairness created by LINA's approach. We conclude that LINA's treatment of Melech's SSA application is inconsistent with the fundamental requirement that an administrator's decision to deny benefits must be based on a complete administrative record that is the product of a fair claim-evaluation process.").

Here, all testimony on oil and gas industry terminology and practices was available to the committee.[195] Logically, the same analysis applies to how things actually

---

[195] *See, e.g.*, ROA.1580 Barton Deposition p. 30 lines 14-18 ("Q. Other than that, what resources were available to the subcommittee to help them understanding -- help them with understanding industry terms or operational practices or regulations as might be needed? A. Anything they wanted, if they asked for it." … ); ROA.1581 Barton Deposition p. 35 lines 2-11 ("Q. And what

worked in the Kermit OCC, including whether training was actually required — regardless of regulations or what might benefit someone seeing how operations work. The Gale and Gift declarations address additional information that was available to the committee.

Again, David Gale was within the control of the committee and "the" expert on the OCC as head of the OCC at the time. He headed the Kermit OCC involved in this case.[196] He did so both before and after Oxy acquired Anadarko.[197] He did so during the time the committee made decisions on the claim.[198] His email raising safety concerns about having untrained individuals fill in for his trained employees in the Kermit OCC is part of the administrative record.[199]

Another way of addressing this is to say this available information should have been part of the administrative record.[200]

---

resources were available to help the committee with interpretation and understanding of industry terms, operational practices, and oil and gas regulations that might be relevant to benefit decisions under the COC plan? A. If the committee didn't feel that they had enough knowledge or information about a particular claim or situation, then they would ask me to pull other information for them or find out other information …").

[196] *See supra* Statement of the Case Part III(F).

[197] *Id*. at Part III(F)(2).

[198] *Id*.

[199] *See supra* Statement of the Case Part III(F)(1)-(2).

[200] *Cf. Crosby*, <u>647 F.3d at 263</u> (noting that "the administrative record compiled by Blue Cross failed to contain all relevant information made available to Blue Cross prior to the filing of this suit" and

### 2. consideration of available information as consistent with fiduciary duties

The rule about *availability* and *fair opportunity to consider* is consistent with fiduciary duties owed to participants. The committee, as a fiduciary, cannot close its eyes to available information that could confirm entitlement to benefits. *See, e.g.*, *D.K. v. United Behavioral Health*, 67 F.4ᵗʰ 1224, 1237 (10ᵗʰ Cir. 2023) (under ERISA, a plan administrator "cannot shut [its] eyes to readily available information" that could confirm a beneficiary's entitlement to benefits, and, if it does so, it has acted "arbitrarily and capriciously"); *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 808 (10ᵗʰ Cir. 2004) ("[a]n ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter.").

Contrary to many cases in which evidence is uniquely within the control of the claimant, this information was within the control of, and available to, the committee at the time it made its benefit determinations.

---

reversing summary judgment in part because that kind of information — "evidence that would indicate whether the administrative record was complete" is discoverable).

**3.    information committee knew or should have known is admissible even outside the administrative record**

The Fourth Circuit held that a district court "properly consider[s] limited evidence outside of the administrative record but known to [the plan sponsor and committee] when it rendered [the] benefits determination" under a pension plan. *Helton v. AT&T, Inc.*, 709 F.3d 343, 348 (4ᵗʰ Cir. 2013). It first noted that, "[g]enerally, consideration of evidence outside of the administrative record is inappropriate when a coverage determination is reviewed for abuse of discretion." *Id.* at 352.But it then noted that its precedent "focused on whether evidence was known to the administrator when it rendered its decision, not whether it was part of the administrative record." *Id.*

The Fourth Circuit explained:

Not surprisingly, then, AT&T cannot cite, nor have we found, any case in which we have held that a district court could not consider evidence from outside of the administrative record when that evidence was known to the administrator at the time the administrator rendered its benefits determination. Indeed, other Circuits confronted with a plan administrator that knew or should have known of certain pieces of evidence outside of the administrative record have held that a district court properly considered such evidence on abuse of discretion review.

*Id.* at 353.

The Fourth Circuit also explained its rationale. If plan administrators have an "unchecked opportunity to pick and choose what evidence in their possession to include in the administrative record," courts "would have effectively surrendered our ability to review ERISA benefits determinations because plan administrators could simply omit any evidence from the administrative record that would suggest their decisions were unreasonable." *Id.*

The Fourth Circuit went on to explain when a plan administrator may be charged with knowledge of evidence outside the administrative record. *Id.* at 356. In reliance on basic agency principles, it concluded that "an ERISA plan administrator can be charged with knowledge of information acquired by its employees in the scope of their employment and the contents of its books and records." *Id.* The court found certain documents and testimony admissible because (1) it helped the court decided whether adequate materials supported the benefit committee's appeal decision and (2) that evidence "was known to, or in the control of, AT&T when the Benefits Committee made its decision." *Id.* at 357.

The admissible testimony was from someone who worked for AT&T when the benefit decision was rendered. *Id.* So, the benefits "[c]ommittee easily could have communicated with [that witness] regarding any facts relevant to [the] claim." *Id.*

The present case compels the same result and is consistent with Fifth Circuit guidance explained above.

### E.   Lack of full and fair review for OCC claim [Issue 6]

When, in a final appeal decision, the fiduciary claim administrator changes it reason for denying benefits, the administrator violates ERISA's full and fair review requirement. *See generally Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 392-94 (5th Cir. 2006). ERISA requires that a plan:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.

When an administrator changes its reason for denial during the appeal process, the participant "never ha[s] an opportunity to contest at the administrative level this new basis for terminating his benefits." *Robinson*, 443 F.3d at 393. Again, the "lack of a full and fair review is an independent basis to overturn an administrator's denial of benefits." *Napoli,* 624 Fed. App'x. at 865. At a minimum, it is evidence of abuse of discretion.

Here, the committee originally denied the claim concerning work in the Kermit OCC because the coverage duty was allegedly voluntary.[201] In the final denial letter, the committee raised a new basis for denial — a measurement technician's claim that training was not required to work in the Kermit OCC.[202]

In deciding whether to remand, all evidence should be considered:

> In making this determination, the court should consider not only the evidence in the administrative record, but also the evidence that the plaintiff would have submitted but for the administrator's procedural violations.
>
> — *Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 158 n.22 (5th Cir. 2009)

One issue in *Lafleur* was whether to remand to the claim administrator due to lack of full and fair review. *See generally Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 157-58 & n.22 (5th Cir. 2009). The Fifth Circuit explained: "The administrator should not be allowed to hinder the development of the administrative record through its procedural violations ...." *Id.* at 158 n.22. If the Court agrees that the committee denied full and fair review in changing the reason for its decision on appeal, all evidence should be considered in deciding whether or not to remand the case to the plan administrator. Gift contends that, considering all the evidence, remand is

---

[201] *See supra* Part III(F)(6).

[202] *Id.*

not necessary because the abuse of discretion is clear, and the committee should not have another chance to add to the record.

## F.    Change in substantial evidence standard

The essence of review for abuse of discretion turns on whether a decision is reasonable and impartial. *See, e.g.*, *See Conkright v. Frommert,* 559 U.S. 506, 521 (2010) (discussing fiduciary's duty to "exercise[s] [its] discretion honestly and fairly."); *Vega*, 188 F.3d at 301 ("A review of the evidence available to National Life at the time it denied the claim illustrates that its decision was not reasonable."). The Fifth Circuit overruled the *Pierre v Connecticut General Life Ins. Co.* holding that courts owe deference to fiduciary fact findings even absent plan language conferring discretion. *Ariana M.* 884 F.3d 246.

But The Fifth Circuit did not disturb that portion of the *Pierre* holding limiting deference to "an administrator's factual conclusions that reflect a reasonable and impartial judgment." *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552, 1562 (5th Cir. 1991), *overruled on other grounds*, *Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246 (5th Cir. 2018).

The current Fifth Circuit substantial evidence standard for abuse-of-discretion ERISA cases is incorrect in light of United States Supreme Court direction, for the

reasons explained in Justice Oldham's concurring opinion cited here. *Michael P. v. Blue Cross & Blue Shield of Tex.*, No. 20-30361, 2021 WL 4314316, *10 (5th Cir. Sept. 22, 2021) (per curiam ) ("It appears that we've wandered far astray. The Supreme Court warned us not to use LMRA principles to review ERISA claims. We did so anyway. And then we adopted a flavor of substantial-evidence review that bears little resemblance to one we'd use in an administrative law case. All of this makes it particularly difficult for ERISA beneficiaries to vindicate their rights under the cause of action created by Congress. And it does so with no apparent support in law, logic, or history.") (Oldham, J., concurring).

## CONCLUSION AND REQUESTED RELIEF

Gift respectfully requests that the Court reverse the grant of summary judgment, render judgment in his favor, and remand the case for further proceedings consistent with the Court's opinion.

Respectfully submitted,

*s/ Amy Gibson*

_____

Amy E. Gibson
Texas Bar No. 00793801
amy@gwfirm.com

David L. Wiley
Texas Bar No. 24029901
david@gwfirm.com

Gibson Wiley PLLC
1500 Jackson Street #109
Dallas, Texas 75201-4923
T: (214) 522-2121
F: (214) 522-2126

*Attorneys for Appellant Jerry Clayton Gift*

## AMENDED CERTIFICATE OF SERVICE

The undersigned certifies that, on March 14, 2024, she filed the foregoing corrected appellant's brief with the Fifth Circuit Court of Appeals, through the CM/ECF Document Filing System, such that the foregoing document should be served on all parties through their counsel of record, who are registered CM/ECF users, as shown below.

The undersigned again certifies that, on February 27, 2024, she previously filed the Appellant's Brief document with the Fifth Circuit Court of Appeals, through the CM/ECF Document Filing System, such that the document was served on all parties through their counsel of record, who are registered CM/ECF users.

**Via CM/ECF**
Ms. Kristina Williams
kristina.williams@nortonrosefulbright.com
Ms. Shauna Johnson Clark
shauna.clark@nortonrosefulbright.com
Ms. Kimberly F. Cheeseman
kimberly.cheeseman@nortonrosefulbright.com
Mr. Andrew Yeh
andrew.yeh@nortonrosefulbright.com
Norton Rose Fulbright US LLC
1301 McKinney #5100
Houston, Texas 77010-3095

*Attorneys for Appellees*

*s/ Amy Gibson*

_____

Amy E. Gibson

## AMENDED CERTIFICATE OF COMPLIANCE

The undersigned certifies that:

1.  This brief complies with the type-volume limitation of <u>Federal Rule of Appellate Procedure 32(a)(7)(B)</u>. This brief contains 11,583 words, *including* portions exempted under <u>Federal Rule of Appellate Procedure 32(f)</u> and Fifth Circuit Rule 32.1. The undersigned relied on the word count function in Microsoft Word for Mac 2024 version 16.82.

2.  This brief complies with the typeface requirements of <u>Federal Rule of Appellate Procedure 32(a)(5)</u> and Fifth Circuit Rule 32.1 and the type-style requirements of <u>Federal Rule of Appellate Procedure 32(a)(6)</u>. This brief was prepared in a proportionally-spaced typeface using Microsoft Word for Mac 2024 version 16.82 in Equity A 14-point font for the body and in Equity A 12-point font for footnotes. The cover page and headings include font size larger than 14-point. The cover page includes one instance of Old English Text MT for the name of this Court.

*s/ Amy Gibson*

_____

Amy E. Gibson